OSCN Found Document:IN THE MATTER OF M.K.T.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 IN THE MATTER OF M.K.T.
2016 OK 4
Case Number: 113110
Decided: 01/20/2016
As Corrected: February 1, 2016
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2016 OK 4, __ P.3d __

 

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 
 


 

IN THE MATTER OF M.K.T., C.D.T., and S.A.W., Deprived Children:
STATE OF OKLAHOMA, Petitioner/Appellant,
v.
TRACEY NICOLE PIGG (Natural Mother), CLAYTON WILLBOURN (Natural Father), Respondents/Appellants,
and
PATTY DUCKWORTH (Foster Mother), Appellant,
and
S.A.W., Appellant,
and
CHEROKEE NATION, Intervenor/Appellee.

CERTIORARI TO THE OKLAHOMA COURT OF CIVIL APPEALS, DIVISION NO. III

¶0 The Honorable Wilma Palmer, Special Judge, for the District Court of Tulsa County, ordered the transfer of a minor child S.A.W., from a foster home to a home compliant with the Indian Child Welfare Act. The State, natural father, natural mother, child, and foster mother appealed. The Court of Civil Appeals reversed the order of the district court and the Cherokee Nation sought certiorari. We previously granted certiorari. We hold that appellants failed to satisfy their burden that natural father was not a member of his tribe. The Cherokee Nation met its burden to show that the child was subject to the Indian Child Welfare Act. We hold that when a tribe fails to provide timely temporary foster care with an ICWA-compliant home and an ICWA-noncompliant family seeks a permanent placement, the trial court should consider harm to the child resulting from a tribe's untimely motion to move the child to an ICWA-compliant home. We hold the proper standard for a party showing a need for an ICWA-noncompliant child placement is clear and convincing evidence, and that appellants met this burden. We reverse that portion of the trial court's order directing an ICWA-compliant placement. We hold that the appellants' additional arguments for challenging application of the ICWA are insufficient and affirm the trial court in part, and remand for additional proceedings.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL APPEALS VACATED; ORDER OF THE DISTRICT COURT AFFIRMED IN PART
AND REVERSED IN PART; CAUSE REMANDED FOR FURTHER PROCEEDINGS 

Becki A. Murphy, Murphy Francy PLLC, Tulsa, Oklahoma, for Appellant, Foster Mother.
Larisa Grecu-Radu, Assistant District Attorney, Tulsa County Juvenile Bureau, Tulsa, Oklahoma, for Appellant, State of Oklahoma.
Kacie R. Cresswell, Owasso, Oklahoma, for Minor Child, S. A. W.
Delorus Crawford, Tulsa, Oklahoma, for Natural Mother.
Brian Wilkerson, Tulsa, Oklahoma, for Natural Father.
Robert Garcia, Assistant Attorney General of Cherokee Nation, Tahlequah, Oklahoma, for Intervenor/Appellee.
Chrissi Ross Nimmo, Tahlequah, Oklahoma, for Intervenor/Appellee.


EDMONDSON, J.
¶1 The district court ordered the transfer of a minor child, S.A.W., to a foster-adoption home that was in compliance with the Indian Child Welfare Act and the Oklahoma Indian Child Welfare Act, and in the bests interests of the child. Foster mother, natural mother, father, child, and the State appealed. We hold the proper standard for a party showing a need for an ICWA-noncompliant child placement is clear and convincing evidence; and the evidence presented by appellants was sufficient to satisfy their burden, regardless whether we apply abuse-of-discretion or clear-and-convincing standards. We hold the circumstances of this case do not warrant reversal of the judge's order based upon 10A O.S. § 1-4-812. We hold appellants failed to satisfy their burden challenging natural father's status as not a member of his tribe. The Cherokee Nation met its burden showing the child was subject to the Indian Child Welfare Act. We hold the evidence was sufficient to show an ICWA-noncompliant temporary placement as in the best interests of the child. We affirm the district court's order in part and reverse in part.
¶2 In May 2013, the State placed two-year-old S.A.W. and her two older siblings in emergency protective custody in different homes and filed a petition to adjudicate the children as deprived due to neglect, lack of supervision and exposure to substance abuse. The natural mother is a non-Indian. S.A.W. was placed with foster mother and the placement was not compliant with the Indian Child Welfare Act, (ICWA), (25 U.S.C. §§ 1901-1963). The parties dispute whether the child's father is a member of the tribe and if the child's placement is governed by the ICWA.
¶3 For nine months after the placement of S.A.W., the Oklahoma Department of Human Services (DHS) contacted extended family of both natural mother and natural father to find an ICWA-compliant placement for S.A.W. The family members contacted were either unsuitable or not interested in a placement. DHS sought help from the Cherokee Nation in finding an ICWA-compliant placement for the child.
¶4 In February 2014, DHS recommended that a placement for the child should ultimately lead to a permanent placement because of a plan to seek termination of the parental rights of S.A.W.'s parents. The Cherokee Nation had not had a family available for foster care, but did have an ICWA-compliant family that was interested in adoption of a child. The parental rights of the parents had not been terminated.[1] Visitations started with this ICWA-compliant family in April 2014. Visitations ceased with this prospective family, and on the one-year anniversary of the child being taken into custody the Cherokee Nation filed a motion to transfer the child to an ICWA-compliant placement. The trial court held a hearing and on July 21, 2014, the trial court determined that appellants had failed to demonstrate a good cause to deviate from the ICWA placement preferences and also found that it was in the best interests of S.A.W. to move to an ICWA-compliant home.
¶5 The State of Oklahoma, natural mother, natural father, foster mother, and S.A.W. appealed. The Court of Civil Appeals reversed the trial court's decision. The Cherokee Nation sought certiorari from this Court to review the opinion of the Court of Civil Appeals. We vacate the opinion of the Court of Civil Appeals and affirm the order of the District Court in part and reverse in part.
¶6 On appeal, appellants argue the trial court (1) violated the rights of natural mother and natural father to participate in the care, custody, and maintenance of their child; (2) erroneously failed to find good cause to deviate from the ICWA's placement preferences, ordering removal of the child from the foster mother's home; (3) failed to address whether the child was an Indian child for the purposes of the ICWA; (4) failed to address whether the father was no longer a member of the tribe; (5) failed to give statutorily-required "great weight" to the foster mother's quest for custody; and (6) failed to place custody in accordance with the child's best interests.
¶7 The Cherokee Nation responds (1) both parents were represented by counsel and participated in the trial court hearing where they expressed their opinions on the matter, and the trial court considered what they said; (2) no evidence showing good cause to deviate from the ICWA was presented to the trial judge; (3) the trial court did address whether the child was an Indian child for the purposes of the ICWA; and (4) the trial judge properly followed the ICWA and ordered placement according to the bests interests of the child.
I. Hearing in the District Court.
¶8 A hearing was held on the Cherokee Nation's motion to move the child to an ICWA-compliant placement. A summary of the testimony is as follows.
A. Natural Father
¶9 Natural father testified by telephone with his counsel present. He agreed that he had been "incarcerated during the whole pendency of this case." He was aware of his child's placement with the foster mother, and she had brought the child to visit him twice at the facility where he was incarcerated. The foster mother sent him photos of the child and kept him informed of her activities. He gave an opinion that moving his child "would be harmful for her emotional well-being." He stated his preference that the child remain with the foster mother.
¶10 Natural father also testified he had "filed a tribal relinquishment form" which he had signed. He stated he had filed the form in April or May of 2014 because "I was informed that it would, uh - - it would - - well, it would help keep . . . [the child] where she's at." (Name omitted and explanation added). He said " . . . it was in hopes that, uh, it would take the matter out of - - out of the Tribe's hands." He said the foster mother visited him during his incarceration and brought him the papers to sign and a notary to notarize them. He said he did what he thought was best for the child. He said if his parental rights and those of the natural mother were terminated, then he would prefer the child to be adopted by the foster mother.
¶11 Natural father said he was willing to "disenroll" if it would help keep the child where she's at. He also said he was "definitely not" pressured in any way to sign the tribal relinquishment, and he had signed it of his own free will. He said the Cherokee Nation had brought him papers to enroll the child in the tribe when he had been incarcerated in the county jail. He said the Cherokee Nation had not informed him of the particular facts concerning its proposed placement of the child
¶12 When questioned whether he knew that DHS and the Cherokee Nation "had a dual certified home that is ICWA compliant" for the child, he responded that he was unaware of anything about this home. He said he did not know whether the child was "seeing any kind of a counselor or a therapist."
¶13 Counsel for the Cherokee Nation said "a child who is the subject of a custody proceeding cannot be unenrolled during the pendency of that proceeding." He also said that once a person unenrolls, "it's a minimum of five years before you can reenroll." Natural father said he was unaware of these rules.
B. DHS Child Welfare Specialist
¶14 A child welfare specialist employed by DHS testified concerning the child's placement with the foster mother since May 2013. He said the placement was not ICWA-compliant. He said the child had developed strong attachment to the foster mother, and the child was thriving in her placement. He said the child was receiving therapy.
¶15 He said he had maintained communication with a tribal worker from August 2013 to February 7, 2014. He said relatives of the child were either not available or disqualified from accepting the child's placement. He said the child was safe and had a healthy attachment with the foster mother. He said the best interests of the child would be served by the child remaining with the foster mother.
¶16 He testified that the child could have handled a transition that placed her with the foster home recommended by the Cherokee Nation if the placement had occurred within two months of DHS taking custody of the child. He said the "level of attachment" at two months is different than the level of attachment after one year and two months with the foster mother.
¶17 He testified that in "maybe January" a concurrent plan for adoption of the child began to be explored. He was asked at what point would the family recommended by the Cherokee Nation have been considered by DHS as a "fost-adopt home" for the child. He responded: "if they had come forward first month, then they would have - - the first month of . . . [the child] coming into DHS custody, then they would have been considered. If it was the second month - - it's difficult to say at what point would they have been considered." He agreed that the home recommended by the Cherokee Nation had been certified by DHS since 2012 and certified by the Cherokee Nation as well.
¶18 He testified of his concern regarding certain behaviors of the child. He was asked "why do none of these behaviors show up in any report that is in this case file?" He responded that he addressed those behaviors with the foster mother. He then said with regard to the child's behavior "I don't think it was important enough to put in the case file. . . . I highlighted some behaviors, and other behaviors I addressed with foster mom." He testified that the child had exhibited aggressive behavior at a daycare, and these reports concerning the daycare he received from the foster mother. On cross-examination he explained that while not everything concerning the child's behavior was in the court file, he had documented his concerns in his separate personal file. He said that some of his concerns he expressed to the District Attorney's office, and some of the information would be in "the DA report."
¶19 He said he transported the child to a DHS office where the child visited with the family recommended by the Cherokee Nation, and "just before the visit ended the child started crying because she wanted her foster mother."
¶20 In the Spring of 2014, he recommended to the foster mother a specific therapist for the child and the foster mother. The therapist started working with the child and foster mother in April 2014. He did not notify "the other attorneys" that the child was seeing a therapist. He did not notify the Cherokee Nation that the child was seeing a therapist. When asked why he did not inform the Cherokee Nation of the therapy sessions, he replied: "it wasn't requested, and I felt that it was in her best interest." When asked if it would have been difficult for the Cherokee Nation to know about the therapist, he replied: "unless I give them reports, it will be difficult for them to know what's going on." He then said that the therapy sessions were something the Cherokee Nation would have known through its visits.
¶21 On cross-examination he stated that the family selected by the Cherokee Nation would not have been considered for foster placement because they had expressed a preference for an only-adoption placement. He said that at that time no parental rights had been terminated relating to the parents of the child, and the family recommended by the Cherokee Nation were interested in adopting the child. He also stated that the ICWA-compliant family was not considered because they were certified "out of Osage County."
C. Therapist
¶22 A social worker employed by Saint Francis Hospital, and as a therapist for other organizations, testified. In this latter capacity she met regularly with the child and the foster mother starting in the Spring 2014. The therapist stated that the child had aggressive behavior in kicking her peers and teachers. She received this information from the foster mother but did not follow up with the daycare to find out anything more about the behavior. She also stated that the child had separation anxiety when apart from the foster mother. This too was based upon statements made by the foster mother reporting behavior of the child to the therapist. The therapist said she had not discussed these matters with the child because the child is "not really able to verbalize, very well, her feelings." She testified she had not observed anything that would make her distrust information she received from the foster mother. She also testified that she had personally observed inappropriate behavior of the child when the child was separated from the child's foster mother, and she gave an opinion concerning the child's behavioral expressions of anxiety when the foster mother was away on a business trip.
¶23 The therapist said she reported that the child displays irritability, sadness, and anxiety after visits with her biological family. She said this information came from the foster mother. She said the foster mother provides a structure and routine which is important for the child. The therapist was asked, assuming everything reported about the child was true, "do any of those [behaviors] appear to be extreme in nature?" She responded with the one-word answer: "No." However, on cross-examination she said the child's behaviors, as reported by the foster mother, were typical for children who had been traumatized; they were extreme when compared to a normal three-year-old.
¶24 The therapist was asked if it would be likely for the child "to be able to transition to another foster home successfully if it was done in a careful, nurturing way." She responded that it would be likely that the child would "experience another trauma" because "you will traumatize them [children] every time you move them." The therapist stated that she had observed the child interact with the foster mother and foster mother's roommates, but had not observed the child interact with the people in the home proposed by the Cherokee Nation. When asked if she had any reason to believe that the family recommended by the Cherokee Nation wouldn't be able to attend to the child's physical or emotional needs, she responded with "I don't have any reason to believe they would, either." She said the child was "well cared for" by the foster mother, and the child was healthy and happy in the care of the foster mother.
D. Natural Mother
¶25 The natural mother testified. She expressed her preference for the child to remain with the foster mother. She said the foster mother takes good care of the child and a bond had grown between the child and the foster mother. She said if parental rights were ever terminated she would want the child to be with the foster mother. On cross-examination she testified concerning her knowledge of her daughter's daily activities and visits with her child.
E. Cherokee Nation Social Worker
¶26 He testified that the Cherokee Nation was trying to make the child's placement ICWA-compliant.[2] The Cherokee Nation made a recommendation on or about February 7, 2014, that the child be moved. He was asked why the Cherokee nation wanted the child to be moved to an ICWA-compliant home. He responded with several statements explaining why the ICWA was created.
¶27 He was asked to identify a photocopy of a "Western Cherokee Nation" identification card with a photograph thereon and a name corresponding to the foster mother. He stated the Western Cherokee Nation is not a federally recognized tribe and not recognized by the Cherokee Nation.[3] He was questioned on how well he knew the foster mother and the type of home she provided the child. He said he knew the foster mother was previously employed by the Cherokee Nation.
¶28 He said he had, on behalf of the Cherokee Nation, previously recommended a deviation from the ICWA guidelines with regard to placement. He said the parents have been adjudicated as depriving their children, and they were not able to make the daily decisions.
¶29 He said the Cherokee Nation had access to an information database since approximately April 26, 2014, wherein it is revealed that the child was receiving therapy. He said the database also documented around April 2014 certain troubling behaviors of the child. He said the tribe typically has an intention that DHS will inform the tribe if something traumatic occurs or an issue arises concerning a child who is a member of the tribe. He said the last time he saw the child was during a visitation with the ICWA-compliant family in April 2014.
F. Foster Mother
¶30 The foster mother's home is not an ICWA-compliant home certified by the Cherokee Nation or DHS. Counsel for the State and the foster mother argued that the foster mother had a "Western Cherokee culture" and that culture was an Indian culture, although the "Western Cherokee Nation" is not a federally recognized tribe. Counsel for the foster mother and the State agreed that the "Western Cherokee Nation" is not a federally recognized tribe.
¶31 Foster mother stated she was dating a Cherokee whom she has known for seven years. Her roommate has passed the necessary background checks and completed the foster parent training. She was employed by the Cherokee Nation from 2006 until March 2014. On April 16, 2014, DHS notified her that they intended for the child to be moved to an ICWA-compliant home, but the notice was withdrawn the following day.
¶32 She testified about the number of people in her life and that of the child, and the status of these people as members of various tribes. For example, she explained that the child's two alternate caregivers are Cherokee and Choctaw/Chickasaw. She explained she had many friends and acquaintances who are tribal citizens. She testified that she attends many community events and volunteers "through the Cherokee Nation." She had a lot of ties to the tribe and she knew what resources were available "to keep her [the child] connected to that culture." She testified concerning the nature of her former employment with the Cherokee Nation, and how that employment gave her knowledge of the cultural resources available for the child. She said she could teach the child about the child's Cherokee culture.
¶33 She testified on her efforts in helping the child meet with her biological mother and siblings. She said she did not pressure or promise the natural father any benefit for him to relinquish his membership status with the Cherokee Nation. She said she was the person who requested a therapist for the child because "there might be some trauma she has" and "I understood there was an - a potential to move her, if that happened I wanted somebody to be a constant for her that she could talk to and - counsel her through a transition."
¶34 On cross-examination she explained that she was concerned with aggressive conduct that included kicking, talking back, and some spitting. She said the conduct appeared before the visits with the ICWA-compliant family but "there are some additional ones since then."
G. Indian Child Welfare Expert
¶35 The witness is employed by the Cherokee Nation Indian Child Welfare, and the parties stipulated as to her qualifications as an expert in Indian Child Welfare. She supervises several Cherokee child welfare workers. She was the supervisor of the Cherokee child welfare worker who had been assigned to the child's case at the beginning until that worker went on family leave in February 2014; thereafter she supervised a replacement worker.
¶36 She explained that she had a phone conversation with the DHS Child Welfare Specialist in March of 2014 to notify him of the Cherokee Nation approved home and to ask him if anything had been put in place to start visitation, "or just what the plan was for it." She said she followed up the conversation about a week to ten days later with an email dated March 18, 2014. She testified that she inquired of the ICWA-compliant family and they informed her that the DHS worker had made contact, but had not set up any visits. She testified that visitation with this family did not occur until after several emails from her to the DHS worker requesting visitation to start. She said the first visit was approximately April 16, 2014.[4] She testified on the positive behavior of the child during the second visit with the ICWA-compliant family. She said she transported the child to place where the visitation occurred, talked with the child during the occasion, and observed the visitation.
¶37 She testified that it was in the best interests of the child to be placed in an ICWA-compliant tribal home: "she needs to know where she came from, and not just superficially, but the cultural aspects that come from people who have been raised in - - in their culture." She testified that she had worked cases where a child was transitioned into a new home "after spending significant periods of time in a different foster home." She said that she had success with those transitions "where the current foster home and the new foster home are willing to work together and to do a transition plan . . . it's not successful for a child to just yank them out of one home and put them in another." She responded affirmatively to counsel's question that she was asking the district court "to find that good cause does not exist to deviate from the placement preferences and to begin the transition process for . . . [the child] into the . . . [ICWA-compliant family's] home." She said this transition was in the best interests of the child.
¶38 On cross-examination she said she had checked with the registration department of the Cherokee Nation and at that time relinquishment of tribal status by the natural father had not been recognized by the Cherokee Nation. She was asked concerning the registration department "Did they ever actually receive the requests [for change in membership status]?" She responded, "not that I know of." She was asked if she would be surprised to learn that a request for change in membership had been sent to her as an email attachment from a DHS employee. She indicated a copy of the father's form could have been in an email attachment she received. She testified that tribal membership is handled by the tribe's registrar's office, and she is not employed in that office.
¶39 She testified her recommendation to move the child would not be altered if the foster mother sought to be placed on the membership roll of the Cherokee Nation. She said the child needed to be transitioned for a permanent placement, the process of being placed on the tribal roll does not happen quickly, and waiting for years was not in the best interests of the child. She stated that her failures in moving children occur "when a child is immediately removed from a home and immediately placed in another one."
II. The Indian Child Welfare Act and Appellate Review
¶40 On May 6, 2013, the State of Oklahoma assumed custody of S.A.W. and one year later on May 6, 2014, the Cherokee Nation filed a motion to move the child to an ICWA-compliant placement with a family seeking to adopt. No parental rights had been terminated at this time. On the day of the hearing, a joint objection was filed by the biological parents, foster mother, and State of Oklahoma, with a request for the trial court to find good cause to deny a change in the child's placement. The trial judge granted the motion by the Cherokee Nation and ordered that the move "be structured over time," the visits with the ICWA-compliant family to continue, and "I'm asking the Department of Human Services to work with the Cherokee Nation, as well as the foster parent, in developing a transition plan for this minor child." The trial judge noted the objection to the judge's ruling by the foster mother, the child's attorney, and the State.
¶41 We explained in Matter of Baby Boy L, the federal Indian Child Welfare Act (25 U.S.C. §§ 1901-1963) was enacted in response to concerns regarding the consequences to Indian children, Indian families, and Indian tribes of state child welfare practices which had separated Indian children from their families and tribes.[5] The Act provides "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which reflect the unique values of Indian culture."[6]
 
¶42 The Oklahoma Indian Child Welfare Act (OICWA), 10 O. S. 2011 §§ 40-40.9, was created to clarify state policies and procedures regarding the implementation of the federal Indian Child Welfare Act.[7] The Oklahoma Act states that the placement preferences specified in § 1915 of the federal Act, "shall apply to all preadjudicatory placements, as well as preadoptive, adoptive and foster care placements."[8] We have recently stated "Neither the purpose of the Federal Act nor the Oklahoma Act can be achieved without notice to the tribe or consideration of the placement preferences."[9]
 
¶43 The preferences in the ICWA for adoptive, preadoptive, and foster care, placements are set forth in 25 U.S.C.A. § 1915:
 


(a) Adoptive placements; preferences
In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.
(b) Foster care or preadoptive placements; criteria; preferences
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with--
(i) a member of the Indian child's extended family;
(ii) a foster home licensed, approved, or specified by the Indian child's tribe;
(iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
(iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
(c) Tribal resolution for different order of preference; personal preference considered; anonymity in application of preferences
In the case of a placement under subsection (a) or (b) of this section, if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child, as provided in subsection (b) of this section. Where appropriate, the preference of the Indian child or parent shall be considered: Provided, That where a consenting parent evidences a desire for anonymity, the court or agency shall give weight to such desire in applying the preferences.
(d) Social and cultural standards applicable
The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.
(e) Record of placement; availability
A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section. Such record shall be made available at any time upon the request of the Secretary or the Indian child's tribe.
Section 1915 states that these statutory preferences are to be followed "in the absence of good cause to the contrary."[10]
 
¶44 Section 1903 of the ICWA defines three forms of child placement in child custody proceedings governed by the Act, foster care placement [25 U.S.C.A. § 1903(1)(i)],[11] preadoptive placement [ 25 U.S.C.A. § 1903(1)(iii)],[12] and adoptive placement [25 U.S.C.A. § 1903(1)(iv)].[13] The preferences in § 1915 place these three types of placement into two categories of placement preferences, (1) adoptive [§ 1915 (a)], and (2) foster care and preadoptive [§ 1915(b)]. It is this latter category of preferences for foster care and preadoptive placements that is at issue in this case because of its procedural posture. However, both the foster mother and the ICWA-compliant family acting through the tribe desired to adopt the child. The Oklahoma Indian Child Welfare Act requires a court to use the § 1915 placement preferences,[14]
 
¶45 In 1979, the Bureau of Indian Affairs (BIA) published in the Federal Register its interpretation of the ICWA for application of the Act in state courts, Guidelines for State Courts; Indian Child Custody Proceedings" (Guidelines).[15] Use of the Guidelines is not mandatory, but they are instructive or advisory in nature; we have used them when construing language in the ICWA,[16] and they are the starting point for a best-interests-of-the-child analysis. The Guidelines were updated in 2015.[17] Although they are in the nature of interpretive rules[18] and are instructive and have the potential to be applied retroactively,[19] because the updated Guidelines were created after the trial court hearing and no party has pointed to authority for their use in this proceeding, we apply the Guidelines in effect on the date of the hearing in the trial court when the decision for placement was made.[20]
 
¶46 When applying the "good cause" exception to the placement preferences in 25 U.S.C. § 1915, the Guidelines provide:


(a) For purposes of foster care, preadoptive or adoptive placement, a determination of good cause not to follow the order of preference set out above shall be based on one or more of the following considerations:


(i) The request of the biological parents or the child when the child is of sufficient age.
(ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness.
(iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.
44 Fed.Reg. 67,594. Part F., Dispositions, at F. 3 (a) (i-iii), Good Cause To Modify Preferences.
The Guidelines also provide the burden of establishing the existence of good cause not to follow the order of preferences ... shall be on the party urging that the preferences not be followed.[21]
 
¶47 In the controversy before us, the trial court directed placement according to the ICWA and the burden of showing the existence of good cause not to follow the order of preferences was on the State, foster mother, and biological parents.[22] The parties unite in arguing that we should apply an abuse-of-discretion standard for appellate review of the trial court's order.[23] While this Court has used an abuse-of-discretion review for an order for visitation and placement of a child who has been adjudicated as deprived,[24] we conclude that an order directing an ICWA-noncompliant placement must be supported by clear and convincing evidence.[25]
 
¶48 We recently addressed the proof necessary to support a trial court's finding of "good cause" to deny a transfer from state court to tribal court a proceeding adjudicating foster care placement and termination of parental rights involving an Indian child.[26] We noted the ICWA requirement for transferring a proceeding involving an Indian child from a state court to a tribal court as expressed in 25 U.S.C.A. § 1911(b): "The court 'shall transfer' foster care placement and termination of parental rights proceedings absent objections and a showing of good cause to the contrary."[27] We explained that in parental termination cases, "clear and convincing evidence" is the standard by which the termination-seeking claimant must prove the potential for harm to the child caused by a parent's abuse or neglect.[28] We characterized this proof as more substantial than that afforded by the clear weight of the evidence or abuse of discretion standards.[29] We explained:


. . . we see a similarity in the potential for harm to the relationship between an Indian child and the child's tribe if the standard of proof required for "good cause" not to transfer is inadequate. It could allow a state court to sever the relationship between child and tribe and to determine the future course of Indian children's lives without consideration of the "unique values of Indian culture" being reflected in their ultimate placement. . . The "clear and convincing" standard is the appropriate standard to use here.
In re M.S., 2010 OK 46, ¶ 19, 237 P.3d at 167, citations omitted.
A similar issue is before us today; whether the burden of showing good cause to deviate from the ICWA-specified child placement preferences must be shown by clear and convincing evidence, or by some other standard. Appellants argue they satisfied their evidentiary burden.
¶49 An Idaho court has noted that the introductory language to the BIA Guidelines regarding the ICWA states that use of the phrase "good cause" was designed to provide state courts with flexibility in determining the disposition of a placement proceeding, and applied an abuse-of-discretion standard.[30] A California court has concluded that a clear-and-convincing standard should apply because the Guidelines state that custody proceedings involving Indian children "shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to [the ICWA placement] preferences," and that any ambiguities in the ICWA statutes "shall be resolved in favor of a result that is most consistent with these preferences."[31]
¶50 One function of a standard of proof in the realm of factfinding is to instruct the factfinder concerning the degree of confidence our society thinks the factfinder should have in the correctness of factual conclusions for a particular type of adjudication.[32] Preponderance of the evidence is a standard commonly used in private disputes where the parties equally share the risk of error.[33] We see a potential for harm to the relationship between an Indian child and the child's tribe if the standard of proof required for "good cause" exceptions for an ICWA-compliant foster placement is inadequate. An inadequate standard could allow a state court to sever the relationship between child and tribe and determine the future course of Indian children's lives without consideration of the unique values of Indian culture being reflected in their placement of the children. Using the clear-and-convincing standard for a decision to make an ICWA-noncompliant placement serves the dual purpose of giving a state court flexibility while also allocating the risk of error in accordance with the language in the Act that was designed for protecting a child-tribe relationship.
¶51 The parties litigated the placement of the child with the expectation that the decision would be reviewed using an abuse-of-discretion standard. Although we hold that the proper standard is clear and convincing evidence, we need not remand for a redetermination using this standard because evidence presented by appellants was sufficient to satisfy a clear an convincing burden for continued foster placement with the foster mother.
III. Appellants' Evidentiary Burden and Arguments Concerning "Best Interests"
¶52 Appellants' combined appellate brief argues that the trial court violated "the parents' fundamental right to participate in child rearing, in giving them no voice regarding the placement of their child." Their argument does not challenge the constitutionality of the ICWA, but the importance the ICWA gives to the child-tribe relationship: "The position of the tribe was given greater importance and value, by the Court, than the rights of the parents even though testimony was clear as 'good cause.'" The Cherokee Nation wants the child to remain within its cultural community, as defined by the placement preferences in the ICWA, despite the desire of the parents that the child be placed outside that statutorily-defined community.
¶53 In its 1989 decision, Mississippi Band of Choctaw Indians v. Holyfield, the High Court underscored the central importance of the relationship between an Indian child and his or her tribe, independent of any parental relationship. The Court explained that Congress wanted application of the ICWA to protect tribal survival "Even in cases where the parents consented to adoption" outside of the child's tribe, and Congress had concerns about tribal survival "beyond the wishes of individual's parents."[34] We quoted from this passage in our 2004 opinion, In the Matter of Baby Boy L.,[35] and noted a legislative amendment to 10 O.S. § 40.1[36] when we explained that Indian tribes and nations have a valid governmental interest in Indian children and a continued cultural relationship between the child and that child's tribe.[37]
¶54 They cite Cherokee Nation v. Nomura,[38] and contend that a birth-parent's preference for placement may be sufficient to show good cause for an ICWA-noncompliant placement. Cherokee Nation v. Nomura, supra, cited an opinion from a Kansas court as an example of a court using parental preference for adoption placement with a non-Indian family may be sufficient to invoke the "good cause" exception.[39] The Kansas court noted the language in the Guidelines specifying three areas a court should consider when determining good cause to make an ICWA-noncompliant placement: (i) The request of the biological parents or the child when the child is of sufficient age; (ii) The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness; and (iii) The unavailability of suitable families for placement after a diligent search has been completed for families meeting the preference criteria.[40]
¶55 Section 1915(c) clearly states that a parent's preference for child placement should be "considered."[41] The Guidelines recognize parental preference for child placement. One consequence made clear by the ICWA interests recognized in Mississippi Band of Choctaw Indians v. Holyfield, supra, and In the Matter of Baby Boy L., supra, is that parent's choice or desire for placement of his or her child may be considered, but such selection does not have the legal effect of necessarily superseding the interests of the tribe when a court places a child for foster care. Parental preference is one factor the trial court considers, but that preference does not control the decision made by the trial court.
¶56 The biological parents, DHS welfare specialist, therapist, and foster mother testified, (1) the child was healthy, happy, in a stable environment, and leaving the child with the foster mother was in the best interests of the child; and (2) the child had emotional needs exhibited by aggressive behavior at a daycare, separation anxiety when apart from the foster mother, and placement with the tribe-recommended family should not be granted by the court and was not in the best interests of the child.
¶57 The Guidelines are the starting point for a best-interests-of-the-child analysis. The ICWA's Congressional declaration of policy states that public policy protects the "best interests of Indian children" and the ICWA was created to promote this policy.[42] Our Legislature has stated that the bests interests of the child should be considered whenever it is necessary for a child to be placed outside the home pursuant to the Oklahoma Children's Code,[43] and these interests include but are not limited to the development of the moral, emotional, spiritual, mental, social, educational, and physical well-being of the child.[44] The best interests of a child are paramount in a proceeding pursuant to the Oklahoma Children's Code.[45] While the ICWA should not be construed to produce a result contrary to the bests interests of the child under a State law analysis, neither should a State law analysis produce an "'Anglo' standard" for bests interests of the child that conflicts with the ICWA.[46] The ICWA placement preferences are designed to achieve the bests interests of the child and they are consistent with State law.[47] An ICWA-compliant placement preference is presumed to be in a child's best interests, and appellants' evidence on best interests of the child and deviation from the Guidelines is more properly considered as an attempt to show the second factor of the Guidelines: The extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness, as grounds to support an ICWA-noncompliant placement.
¶58 The DHS child welfare specialist stated that he would not consider any family recommended by the Cherokee Nation for placement of a Cherokee child unless that family came forward to accept placement of that child during the first month the child was in DHS custody. His testimony on this point was in the form of an irrebutable presumption that any child at the age of S.A.W. had an emotional need that should prevent a change in custody more than one month after the first initial placement. His views would turn every initial temporary placement as the presumptive proper long-term placement. His testimony appears to be based upon an improper assumption that a child's emotional need for permanence[48] in placement could only be met through placement during the initial one month DHS custody. The Children's Code attempts to promote stability for foster children and limit repeated placements, but the specialist's one-month rule is inconsistent with provisions in that Code.[49] On the other hand and as we explain herein, we view the tribe's conduct as not in the child's best interests when (1) the tribe failed to timely provide a temporary foster care ICWA-compliant placement, and (2) sought to move the child to an ICWA-family wanting to adopt a child but S.A.W.'s parents had not had their parental rights terminated.
¶59 The assumption of the DHS child welfare specialist is an example of one part of the often debated larger issue whether a child's need for permanence is, or under what conditions it may become, "an extraordinary emotional need" in the ICWA child placements, and whether this issue is determined based upon prevailing cultural and social standards of the child's Indian community as required by the ICWA.[50] The Guidelines require a particularized showing of the extraordinary emotional and physical needs of the particular child when considering the types of placement, and they do not create or authorize the method suggested by the DHS Child Welfare Specialist. His testimony on this point is not a particularized assessment on the needs of this child.
¶60 The testimony of the DHS welfare specialist, therapist, and foster mother addressed whether the child had emotional needs exhibited by aggressive behavior at a daycare and separation anxiety when apart from the foster mother. The Guidelines state that extraordinary physical or emotional needs may be used to justify an ICWA-noncompliant placement, and the therapist said the child's behaviors were not extreme for a child in her circumstances, but extreme when compared to a normal three-year-old. The therapist testified that she had no idea whether the proposed ICWA-compliant placement would be unable to satisfy the emotional and physical needs of the child, apart from the issues relating to the separation of the child from the foster mother.
¶61 Generally, a burden to present facts, claims and legal arguments falls on the party who asserts an entitlement to the judicial relief sought.[51] The Cherokee Nation filed a request for an ICWA-compliant placement. Any facts necessary as predicate for such a placement had to be of record in the trial court proceeding, such as S.A.W. being an "Indian child" and the proceeding being a "child custody proceeding" pursuant to the ICWA.[52]
 
¶62 Appellants' appellate brief states that the trial judge told them the State had the burden of proof to show why the child should not be moved to an ICWA-compliant home. The trial judge is correct. Appellants had the burden to show that the proposed ICWA-compliant placement was not in the best interests of the child, i.e., evidence showing that the placement would not satisfy a serious emotional or physical need of the child.[53] Appellants were the ones making this claim. They were the parties arguing that a serious emotional need exists for the child, and further, that they have the proposed solution for this identified need with the proper placement and plan for the child.
 
¶63 Appellants were also required to introduce evidence that the proposed ICWA-compliant placement would not fulfill this need of the child which their expert witnesses said made placement with the foster mother to be the placement in the child's best interests. Their testimony concerning best interests of the child was produced in the context of objecting to a request for placement with an ICWA-compliant family. The ICWA and Guidelines are clear that if a Indian child's emotional and physical needs may be equally satisfied by an ICWA-compliant placement and an ICWA-noncompliant placement, then the ICWA-compliant placement is preferred. The single argument made by the appellants is that preference in placement should be with the foster mother because of the time the foster mother had custody, the bonds between child and foster mother, and foster mother's desire for permanent placement. There was no testimony at that time relating to the ICWA-compliant family's ability to provide for the emotional and physical needs of the child.
¶64 Because of factors showing the extraordinary nature of this controversy involving a child of tender years, we have taken judicial notice of the docket of the trial court showing events while this appeal has been pending.[54] The docket shows that as of December 2015 the natural father's parental rights have not been terminated, and there is currently no ICWA-compliant family for placement of the child.
¶65 In addition to the ICWA, Congress has created other statutory schemes concerning child welfare policy and practice, such as the Adoption Assistance and Child Welfare Act of 1980 (AACWA)[55] and the Adoption and Safe Families Act (ASFA) of 1997,[56] and its amendments. Two fundamental principles are paramount pursuant to the ASFA, (1) the child's health and safety,[57] and (2) that foster care should be temporary with a permanency hearing no later than twelve months after the child enters foster care.[58] The Oklahoma Children's Code refers to different types of hearings in § 1-1-105, e.g., an "adjudicatory hearing" (§ 1-4-601), "dispositional hearing" (§ 1-4-706), "emergency custody hearing" (§ 1-4-203), "permanency hearing" (§ 1-4-811), and "review hearing" (§1-4-807).[59] While a permanency hearing may be held concurrently with a dispositional hearing or a review hearing,[60] at a permanency hearing the court "shall" determine the appropriate permanency goal for the child and order completion of all steps necessary to finalize the plan. For a § 1-4-811 permanency plan the trial court "shall" (1) plan for reunification with the child's parent(s), or (2) order placement for adoption after termination of parental rights, or (3) placement with the person who will be the permanent guardian, or (4) placement in custody of the DHS under a planned alternative permanent placement; and the trial court must make certain written findings.[61] The motion requesting an ICWA-compliant placement, the transcript of the hearing, and the trial judge's order clearly show that the hearing was not conducted for the purposes and findings of a § 1-4-811 permanency hearing.
¶66 A permanency hearing is to be held "six (6) months after placing the child in out-of-home placements and every six (6) months thereafter." 10A O.S.Supp. 2015 (A)(1)(a).[62] The federal policy in the ASFA is for a court to have a plan for permanency of placement twelve months after a child has entered foster care, although the permanency plan may include parental reunification,[63] and the Act recognizes that termination of parental rights is a decision often made after this time period.[64] Congress has recognized that parent-child bonds are created in foster care relationships and that speed in permanency placement is a federally-mandated goal. In the present case, where the Cherokee Nation provided no family for temporary ICWA-compliant foster care until its formal application filed one year after the State assumed custody of the child and then states in a District Court filing that during the pendency of the appeal it has no current family for an ICWA-compliant placement at a time 2 and 1/2 years after the State assumed custody of the child; the actions of the tribe are inconsistent with the federal policy that Congress created with the ASFA that was designed to diminish the risk of children developing emotional attachments and subsequent behavioral problems caused in part by adults failing to provide timely parental care. The propriety of applying a specific ASFA statute to the tribe is not before us in this proceeding,[65] but we must note that a tribe's efforts for a court-ordered ICWA-compliant placement should be based upon a placement that is available and appropriate for providing timely parental care. An Indian child is entitled to permanency in placement even when the placement is not based upon ASFA requirements but by the ICWA-authorized tribal cultural considerations.[66]
¶67 The Cherokee Nation argued that (1) the child had no serious emotional or physical need, (2) no such need had appeared in certain reports on the child prior to the date of the hearing, and (3) the family they proposed could fulfill the needs of the child. Appellants filed their objection on the day of the hearing and their expert witnesses testified as to what they perceived to be the serious emotional needs of the child. Because appellants are the parties raising the claim of a serious emotional need that cannot be met by an ICWA-compliant placement, they must support that claim with some evidence showing the particular need of the child which they have identified. Their burden is not an instance to plead and prove a negative, but the affirmative burden to show (1) a serious emotional or physical need of the child, (2) a course of action for remedying that need via the placement with the foster mother, e.g., placement with counseling, rehabilitative services, etc.,[67] and (3) some fact or facts showing that the ICWA-compliant placement is inconsistent with the child's needed plan or treatment. Appellants satisfied this burden in the trial court.
¶68 Appellants argued in the trial court that the foster mother had preference in placement based solely upon time of custody by foster mother and the emotional attachment of the child and the foster mother. This argument fairly comprises a claim that the proposed ICWA-compliant family may not satisfy the child's emotional needs.
¶69 Appellants rely on testimony from the child's therapist. When asked whether removal of the child from the foster home, "regardless of how it's done," would cause the child to experience "yet another trauma" the therapist responded "It's likely." Some of the therapist's testimony concerned emotional attachment of children in general, and some testimony was concerning the child in this case. She stated that children who experience multiple traumas have a much greater problem and difficulty in emotional attachment. She then stated that she characterized the child as having multiple traumas. Her testimony may be read as stating that this child will "exponentially" "have difficulty attaching" to a new family.
¶70 The Cherokee Nation Indian Child Welfare specialist testified on the positive behavior of the child during the second visit with the ICWA-compliant family. She said she transported the child to place where the visitation occurred, talked with the child during the occasion, and observed the visitation. She testified that a child could be transferred successfully if the foster home cooperated. She did not provide an opinion on the level of attachment between the child and the foster mother. The evidence before the trial judge was conflicting on the child's reaction to the proposed family.
¶71 It has been noted that courts have struggled with accommodating the statutory goals of the ICWA while simultaneously protecting children's interests in remaining in a stable and secure placement.[68] This struggle has often occurred in the context of a non-Indian custodian arguing that emotional attachment between the custodian and the child outweighs the interest the child's tribe has in an ICWA-compliant placement. An opinion from Montana has held that emotional attachment between a non-Indian custodian and an Indian child should not necessarily outweigh the interest of the tribe;[69] and an opinion from Minnesota has held that a child's need for permanence in placement may come from attachment to the child's tribe.[70] An opinion from Alaska examined the testimony of the expert witnesses, and noted that one of the children met the criteria for emotionally disturbed children, and the trial court evidence showed that placement change "would cause them [the children] special harm."[71] The Alaska court noted specially that its result was consistent with the Minnesota opinion, noting that in the latter case "the finding of good cause was rejected because the children's special needs were not established by expert testimony from persons knowledgeable about Native culture."[72]
 
¶72 In the case before us today, there was no evidence in the trial court that the child was emotionally disturbed as in the Alaska opinion. But there was a showing that the child's attachment to her foster mother was of such a nature that it precluded the possibility of a normal and timely emotional attachment to the proposed ICWA-compliant family who is apparently no longer being considered for placement. The evidence before the trial judge is that the ICWA-compliant family was interested in custody provided that adoption would ultimately follow, although the child's availability for adoption was not a certainty at the time of the hearing. The evidence was sufficient to show that the trial judge was required to deny the Cherokee Nation's motion for an ICWA-compliant placement based upon the emotional attachment of the child to her foster mother. We accordingly reverse the order of the District Court directing an ICWA-compliant placement.
 
¶73 Because the matter is remanded for further proceedings, including appropriate application of the ICWA, and appellants argue that the ICWA does not apply, we address the remaining challenges made to the trial court's order by the appellants.
IV. Application of an Adoption Statute
¶74 Appellants make several other arguments and we address them. Appellants rely on 10A O.S. 2011 § 1-4-812 B. & C., a statute on the eligibility of a foster parent to adopt a child in the care of the foster parent.


A. During any permanency hearing, if it is determined by the court that a child should be placed for adoption, the foster parent of the child shall be considered eligible to adopt the child, if the foster parent meets established eligibility requirements pursuant to this section.
B. If the child has resided with a foster parent for at least one (1) year, the court shall give great weight to the foster parent in the adoption consideration for the child unless there is an existing loving emotional bond with a relative of the child by blood or marriage who is willing, able, and eligible to adopt the child.
C. In making such determination, the court shall consider whether the child has become integrated into the foster family to the extent that the child's familial identity is with the foster family, and whether the foster family is able and willing permanently to treat the child as a member of the family. The court shall consider, without limitation:
1. The love, affection, and other emotional ties existing between the child and the relatives of the child, and the child's ties with the foster family;
2. The capacity and disposition of the child's relatives as compared with that of the foster family to give the child love, affection, and guidance and to continue the education of the child;
3. The length of time a child has lived in a stable, satisfactory foster home and the desirability of the child's continuing to live in that environment;
4. The physical and mental health of the relatives of the child as compared with that of the foster family;
5. The experiences of the child in the home, school, and community, both when with the parents from whom the child was removed and when with the foster family;
6. The age and preference of the child;
7. The long-term best interests of the child; and
8. Any other factor considered by the court to be relevant to a particular placement of the child.
10A O.S.2011 § 1-4-812.
The Cherokee Nation does not address whether a foster parent's § 1-4-812 opportunity for adoption should be considered in a hearing for the purpose of an ICWA-compliant placement. Assuming, but not deciding, that a foster parent could assert his or her § 1-4-812 opportunity to adopt as consideration for placement in an ICWA-compliant placement hearing, we hold that the circumstances of this case do not warrant reversal of the judge's order based upon § 1-4-812.
¶75 Appellants indicate that the § 1-4-812 B. "great weight to the foster parent in the adoption consideration" after a one-year placement trumps the ICWA placement preferences. Section 1-4-812 recognizes the possibility of emotional bonds created during a foster placement.[73] However, it is also important to understand emotional and attachment bonds created during foster placement from the perspective of the child's tribe. The ICWA expressly requires this consideration.[74] The Cherokee Nation child welfare specialist testified she had worked cases where a child was transitioned into a new home after spending significant periods of time in a different foster home, and she had success with those transitions. There was evidence presented by the tribe on how it viewed emotional attachments of children generally, and how this specific child acted in the presence of the proposed family. There was evidence on the emotional bonds between the child and the foster mother presented by appellants. Section 1-4-812 does not create a bar to an ICWA-placement after a one-year foster care non-ICWA placement. Application of the § 1-4-812 "great weight to the foster parent in the adoption consideration" is not given priority over the adoption and placement preferences expressly stated in the federal statute, 25 U.S.C.A. § 1915, and the preference in the state statute does not, by itself, require reversal of the trial court's order.
V. Child's Status as an Indian Child
¶76 Appellants make several arguments based upon the biological father's status with the Cherokee Nation. They state he signed a document stating he relinquished his membership in the Cherokee Nation. They state this fact shows his child is no longer a member of the tribe and an ICWA placement hearing was improper. They argue the trial court was without authority to make an ICWA placement.[75]
 
¶77 Appellants state the fact of the biological father's execution of a document relinquishing his membership in the tribe. Appellants rely upon United States, ex rel. Standing Bear v. Crook, 5 Dill. 453, 25 Fed. Cases 695 (C.C.D. Neb. 1879) (No. 14,891). One federal court referenced Felix S. Cohen's well-known book on Indian law, and noted that Standing Bear is a famous case "in which an Indian secured a writ of habeas corpus directed against a general of the United States Army, to prevent his removal to Indian Territory, the court found that the petitioner, Standing Bear, had severed his relationship with his tribe and was, therefore, not subject to the provisions of any treaties or legislation concerned with the removal of the tribe to Indian Territory."[76] Quoting from Cohen, the court noted that: "Tribal membership is a bilateral relation, depending for its existence not only upon the action of the tribe but also upon the action of the individual concerned. A member of any Indian tribe is at liberty to terminate the tribal relationship whenever he or she so chooses, although such termination will not be lightly inferred."[77]
 
¶78 We have no doubt, as a general principle, a member of an Indian tribe may repudiate his or her membership. Indeed, Congress in the past has used a tribal member's repudiation of tribal relations as a basis for terminating future tribal benefits for that person.[78] Appellants raise a general principle concerning a member's right to disassociate from the member's tribe, and the fact that the biological father executed a document stating such intention. But they fail to address the issue whether this act by the father was recognized, as a matter of Cherokee Nation law or tribal custom, as a change in the father's tribal status or the child's status as a member or potential member of the tribe. Further, they do not address, beyond the assertion of the naked right to resign, whether any failure by the tribe to recognize the father's repudiation of membership by the Cherokee Nation was improper, as we now explain.
 
¶79 In two separate 1978 opinions, United States v. Wheeler [79] and Santa Clara Pueblo v. Martinez,[80] the United States Supreme Court clearly said that a tribe possesses the power to determine tribal membership, unless that power has been limited by treaty or federal statute. The Court's opinions relied upon its previous opinions stretching back in time to 1897 and included a 1906 opinion involving the Cherokee Nation.[81] In Santa Clara Pueblo v. Martinez, the U. S. Supreme Court noted Indian tribes are "'distinct, independent political communities, retaining their original natural rights' in matters of local self-government," and part of this self-government was the power "to make their own substantive law in internal matters," including membership in the tribe.[82] Appellants cite no federal statute or treaty limiting the power of the Cherokee Nation to determine who is a member of their tribe.
¶80 For illustrative purposes and concerning membership in an association, we have explained "an individual may resign from an association as he or she sees fit, subject to financial obligations owing the association, where there are no rules or bylaws restricting the right to resign."[83] We explained (1) Where an association has bylaws and rules they constitute a contract between the members, and membership is regulated by the terms of the contract; (2) The rules of an association governing resignation may be enforced against the member; (3) The rules of an association may not unconstitutionally preclude a resignation; and (4) The rules governing a resignation of a person from an association may not be enforced in an arbitrary or capricious manner.[84]
 
¶81 An Indian tribe may, similar to an association governed by Oklahoma law,[85] restrict a member's right to resign from his or her tribal association by requiring the member to do more than simply submit a document to some tribal official stating his or her intention to relinquish membership.[86] We stress this point because appellants argue at length the father's execution of the document and providing it to his tribe should be legally sufficient for changing his membership status and recognized by Oklahoma state courts. But their argument and evidence do not address whether the tribe requires more for a change in membership than what we have in this case. Because, as a matter of law, tribal membership and procedures relating thereto are determined by the tribe, the record on appeal is insufficient to show whether the father's resignation from membership in the tribe was effective or whether the child's status was altered by the father's actions.
 
¶82 Appellants cite an Idaho case, Matter of Baby Boy Doe,[87] but it does not assist their argument. While a state court may not require a tribe to make a determination that a child is a member or eligible for membership in a tribe, the court recognized the application of the BIA Guidelines by a state court when determining whether the ICWA applies.


B.1. Determination That a Child is an Indian
(a) When a state court has reason to believe a child involved in a child custody proceeding is an Indian, the court shall seek verification of the child's status from either the Bureau of Indian Affairs or the child's tribe....
(b)(i) The determination by a tribe that a child ... is or is not eligible for membership in that tribe ... is conclusive.
Matter of Baby Boy Doe, 849 P.2d at 930, citing 44 Fed.Reg. 67,584 (1979).
United States v. Wheeler, supra, Santa Clara Pueblo v. Martinez, supra, and these Guidelines make the determination of the tribe "conclusive" on the issue whether the child is an Indian child for application of the ICWA.
¶83 Because we hold that appellants did not show the requirements for relinquishment of membership in the Cherokee Nation and if father met them, we need not reach the issue whether a State court has jurisdiction to adjudicate a claim that a tribe wrongfully declined to process a request for relinquishment of membership and whether an ICWA-status is altered by the tribe's conduct.[88]
 
A. What the Record Does Not Show
 
¶84 The record on appeal is insufficient for an argument raised on appeal by the tribe in their answer brief, as well as an argument raised by appellants in their reply brief. We first address the tribe's argument.
¶85 During the hearing, counsel for the Cherokee Nation said "a child who is the subject of a custody proceeding cannot be unenrolled during the pendency of that proceeding." Counsel did not provide a citation to any federal or Cherokee Nation law in support of this statement. Argument of counsel is not evidence.[89] Counsel also refers the Court to a website containing the Cherokee Nation Citizenship Act, LA-16-02, effective May 13, 2002, which apparently, for example, provides for filing with the Registrar the tribe-approved document for relinquishment of membership/citizenship, representation by a sponsor or agent, a hearing with testimony taken concerning the request, and a possibility of a best-interests-of-the-child determination.
¶86 In 1926, this Court stated that state courts will take judicial notice of the statute laws of the Five Civilized Tribes.[90] We are asked in an appellate answer brief to take judicial notice of a document on the Cherokee Nation's website.[91] While an appellee may argue on appeal that in spite of errors the correctness of the trial court's decision requires affirming the order,[92] and an appellate court will affirm a correct judgment on any applicable theory,[93] "we are unable to address issues clearly outside the record" that are raised by appellee for the first time on appeal.[94]
 
¶87 In Panama Processes v. Cities Service Co.,[95] we explained the process for taking notice of foreign law.
 


The trial court may take judicial notice of a foreign country's laws if it can be properly informed of its terms. The applicability and tenor of foreign law is a matter for the court. If the trial court cannot be properly informed of the foreign country's law from reference to its sources, the state of that law is subject to the ordinary proof process as in the case of any other fact. The court may consult or use any source of pertinent information, whether it be offered by the parties or discovered through its own research, in determining the applicability of foreign law. The usual method of proving foreign law is by affidavit testimony of qualified legal experts. The person pleading the law of a foreign country has the burden of going forward with proof of it at the risk of nonpersuasion.
Panama Processes, 796 P.2d at 294, notes omitted.
While there is testimony concerning the Father's actions and what he understood concerning his efforts relinquishing membership, there is no testimony whether an agent acting for the biological father or the tribe either did, or did not, comply with LA-16-02. There is nothing in the record to suggest that LA-16-02 was before the trial court for its application or that the tribe complied with Panama Processes. Litigation of a tribal membership issue involving a mixed question of law and fact, here the application on LA-16-02, should not be raised for the first time on appeal in an answer brief,[96] but should be litigated in the district court and not this Court.
¶88 An appellate reply brief was filed by counsel for one of the appellants and the entire brief focuses on one argument:


Counsel . . . has in her possession, a copy of the Tribal Relinquishments of the minor child . . . and the natural father, both prepared and executed by the natural father on April 19, 2014. In addition, counsel . . . has, in her possession, the correspondence (dated June 26, 2014) that accompanied the Tribal Relinquishments, and proof of service that the Tribal Relinquishments were received and signed for by the Cherokee Nation Registration Department on July 1, 2014.
A reply brief on appeal is not the proper method for making facts appear for the first time in the judicial record: "This court may not consider as part of an appellate record any instrument or material which has not been incorporated into the assembled record by a certificate of the clerk of the trial court, nor may a deficient record be supplemented by material physically attached to a party's appellate brief."[97] This principle is not new or an obscure appellate trap for the unwary,[98] and it is found in the Rules of this Court.[99] The Court does not take judicial notice of private documents kept in the files of a lawyer's office.
¶89 None of appellants' arguments, including the reply brief, address whether the procedure used by the biological father to relinquish membership were considered by the Cherokee Nation to be effective pursuant to the law of the Cherokee Nation. They made no attempt in the trial court to show Cherokee Nation law in accordance with the procedure we explained in Panama Processes. Appellants cannot successfully argue on this record that the Cherokee Nation failed to follow their law for processing a member's relinquishment of membership or that the tribe improperly kept the father a member for the purpose of this litigation.
B. What the Record Shows
¶90 The record shows that at one point during the trial court proceeding all parties agreed that the biological father was a member of the Cherokee Nation and the ICWA applied to custody proceedings for his child. Appellants state in their appellate brief the child was enrolled by the tribe "during the deprived proceeding." In June, 2013, a month after the child was taken into custody, the Cherokee Nation intervened in the trial court proceeding and asserted that the child was an "Indian child" "within the meaning of 25 U.S.C. § 1903(4) and the Oklahoma Indian Child Welfare Act." During the trial court proceeding, appellants sought to assist the father with completing a form or forms for the purpose of relinquishing his tribal membership. During the trial court hearing, the Cherokee Nation's Indian Child Welfare expert testified she had checked with the registration department (registrar) of the Cherokee Nation and the biological father was still a member of the Cherokee Nation.
¶91 A burden to present facts, claims and legal arguments falls on the party who asserts an entitlement to the judicial relief sought.[100] We have explained that the burden of proof as to any particular fact rests upon the party asserting such fact, and when a party must plead and prove a fact will depend upon whether the fact is part of a cause of action or part of a defense.[101]
¶92 The Cherokee Nation intervened and pled the child was an Indian child subject to the ICWA and a representative of the tribe testified at the hearing the child's father was an enrolled member of the tribe. It was uncontested that the child was an Indian child for purposes of the ICWA, except as to the effect of the father's attempts to relinquish his tribal membership. The facts concerning his efforts to resign were put forward by appellants to resist application of the ICWA. Appellants sought a determination that father was not a tribal member in opposition to the Cherokee Nation's assertion. Appellants had the burden to produce evidence on the tribal requirements for relinquishment of membership and whether father had satisfied these requirements.[102] We hold that the Cherokee Nation met its burden to show that the child was subject to the Indian Child Welfare Act. Appellants did not meet their burden to show that the father relinquished his tribal membership, or that such relinquishment could alter the Indian status of the child.
¶93 The trial court's order made express findings identifying the natural father of the child and stating he "is a member of the Cherokee Nation." The court made a finding that the child was an "Indian child" as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4) and the Oklahoma Indian Child Welfare Act, 10 O.S. § 40.2(2). The trial court determined the Cherokee Nation was the child's tribe, and the proceeding involved a child custody proceeding for the purpose of the Indian Child Welfare Act. The court noted placement preferences and that placement could be otherwise when there existed good cause to the contrary. The court's order states that evidence of "good cause to the contrary" was a burden of a party seeking a placement contrary to the ICWA preferences, and that good cause should be based upon the non-binding factors in the BIA Guidelines.
¶94 The trial court made a finding that the child's current placement was in a "non ICWA compliant home" and that an ICWA-compliant home was available. The court stated: "The court does not find good cause to deviate from foster care, preadoptive or adoptive placement preferences found in ICWA." We reverse that portion of the trial court's order. The court also stated: "The court further finds that it is in the best interest of the minor child to continue her membership in her 'Indian tribe' and move to an ICWA compliant placement pursuant to a transition plan." We reverse that portion of the trial court's order.
¶95 Appellants claim that "natural father completed Tribal Relinquishments that were sent to the Cherokee Nation relinquishing the child's membership and the natural father's membership, and the court never ruled on the issue as to whether the child was an Indian Child under ICWA." The trial court expressly ruled that the child was an Indian child subject to the ICWA.
VI. Conclusion
¶96 We hold that the proper standard for a party showing a need for an ICWA-noncompliant child placement is clear and convincing evidence. We need not remand for a redetermination using this standard because the evidence presented by appellants was sufficient to satisfy their burden for placement contrary to the ICWA, regardless whether we apply abuse-of-discretion or clear-and-convincing standards.
¶97 We hold that the circumstances of this case do not warrant reversal of the judge's order based upon 10A O.S. § 1-4-812. Appellants did not show the requirements for relinquishment of membership in the Cherokee Nation and if father met them, and we need not adjudicate the legal effect of the father's efforts. We hold that the Cherokee Nation met its burden to show that the child was subject to the Indian Child Welfare Act. We hold the evidence was sufficient to show a continued temporary ICWA-noncompliant placement as in the best interests of the child.
¶98 The opinion of the Court of Civil Appeals is vacated. The order of the District Court directing placement of the Indian child in an ICWA-compliant home is reversed, and in all other respects affirmed. The cause is remanded for further proceedings consistent with the Court's opinion.

¶99 CONCUR: REIF, C. J., COMBS, V. C. J., KAUGER, WATT, EDMONDSON, COLBERT, and GURICH, JJ.

¶100 CONCUR IN RESULT: WINCHESTER and TAYLOR, JJ.

FOOTNOTES

[1] The mother's parental rights were terminated during the present appeal of the trial court's order adjudicating the Cherokee Nation's motion for placement pursuant to the ICWA.

[2] The parties stipulated to the witness' qualifications as an expert witness in Cherokee tribal customs and child-rearing practices.

[3] During the testimony of the foster mother, the Cherokee Nation objected to the photocopy of a Western Cherokee Nation identification card being admitted into evidence. The objection was based upon relevance and various counsel argued whether an identification card will "demonstrate anything at all about Cherokee culture." The court noted that the foster mother could testify concerning her Cherokee culture, the objection was sustained, and the exhibit was admitted as Court's exhibit No. 1 for the purpose of an appeal.

[4] During the hearing, counsel for the foster mother made a reference to the visits with the Cherokee Nation family as having occurred "Not since February." In response to questions from the judge, counsel for the Cherokee Nation and the Cherokee Nation Social Worker stated that the visits were "cut off" "based upon" the "withdrawal of their notice of removal." According to foster mother's testimony this occurred in April 2014.

[5] In the Matter of Baby Boy L, 2004 OK 93, ¶ 11, 103 P.3d 1099, 1103, quoting 25 U.S.C.A. § 1901.

[6] In the Matter of Baby Boy L, at ¶ 11, 103 P.3d at 1103, quoting 25 U.S.C.A. § 1902.

[7] 10 O.S.2011 § 40.1, states in part: "The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act, P.L. 95-608."

[8] 10 O.S. 2011 § 40.6:
"The placement preferences specified in 25 U.S.C. Section 1915, shall apply to all preadjudicatory placements, as well as preadoptive, adoptive and foster care placements. In all placements of an Indian child by the Oklahoma Department of Human Services (DHS), or by any person or other placement agency, DHS, the person or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act. This requirement shall include cases where a consenting parent evidences a desire for anonymity in the consent document executed pursuant to Section 60.5 of this title. If a request for anonymity is included in a parental consent document, the court shall give weight to such desire in applying the preferences only after notice is given to the child's tribe and the tribe is afforded twenty (20) days to intervene and request a hearing on available tribal placement resources which may protect parental confidentiality, provided that notice of such hearing shall be given to the consenting parent." (Section 60.5 was renumbered as 10 O.S. § 7503-2.1, by Laws 1997, c. 366 §§ 9, 58, eff. Nov. 1, 1997).

[9] Cherokee Nation v. Nomura, 2007 OK 40, ¶ 25, 160 P.3d 967, 976 (emphasis added).

[10] 25 U.S.C. A. § 1915 (a) & (b) , in part, with emphasis added : "(a) Adoptive placements . . . In any adoptive placement . . .a preference shall be given, in the absence of good cause to the contrary, to a placement with . . . (b) Foster care . . . a preference shall be given, in the absence of good cause to the contrary, to a placement with...." Section 1915 has been in effect since 1978. Pub.L. 95-608, Title I, § 105, Nov. 8, 1978, 92 Stat. 3073.

[11] 25 U.S.C.A. § 1903(1)(i): "(i) 'foster care placement' which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated...."

[12] 25 U.S.C.A. § 1903(1)(iii): "(iii) 'preadoptive placement' which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement...."

[13] 25 U.S.C.A. § 1903(1)(iv): "(iv) 'adoptive placement' which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption."

[14] 10 O.S.2011 § 40.6:
The placement preferences specified in 25 U.S.C. Section 1915, shall apply to all preadjudicatory placements, as well as preadoptive, adoptive and foster care placements. In all placements of an Indian child by the Oklahoma Department of Human Services (DHS), or by any person or other placement agency, DHS, the person or placement agency shall utilize to the maximum extent possible the services of the Indian tribe of the child in securing placement consistent with the provisions of the Oklahoma Indian Child Welfare Act. This requirement shall include cases where a consenting parent evidences a desire for anonymity in the consent document executed pursuant to Section 60.5 of this title. If a request for anonymity is included in a parental consent document, the court shall give weight to such desire in applying the preferences only after notice is given to the child's tribe and the tribe is afforded twenty (20) days to intervene and request a hearing on available tribal placement resources which may protect parental confidentiality, provided that notice of such hearing shall be given to the consenting parent.

[15] Guidelines for State Courts; Indian Child Custody Proceedings" (Guidelines), 44 Fed. Reg. 67584 (November 28, 1979).

[16] In re M.S., 2010 OK 46, n. 12, 237 P.3d 161 ("The Guidelines are not statutes and are not mandatory. They represent BIA interpretations of ICWA provisions."); In the Matter of N.L., 1988 OK 39, 754 P.2d 863, 867 ("The guidelines for state courts promulgated by the United States Bureau of Indian Affairs, while not binding on the court, assist in defining a qualified expert witness."). See, e.g., In Re Amendments to Oklahoma Uniform Jury Instructions for Juvenile Cases, 2011 OK 23 (Chapter Five, Indian Child Welfare Act, Introductory Note, Expert Witnesses: "... while the BIA guidelines for state courts are not binding, they are instructive in terms of who may possess the qualifications of an expert witness for ICWA cases.").

[17] Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, February 25, 2015, 80 Fed. Reg. 10146-10159 (Notices), promulgated by Bureau of Indian Affairs, Department of the Interior.

[18] Generally, administrative agencies create (1) "legislative rules" which are binding similar to a statute and created only within legislatively-granted authority, and (2) "interpretive rules" which are not binding on courts, may be deemed instructive and advisory, and are often expressed as guidelines and agency policy statements. John P.C. Duncan, The Course of Federal Pre-Emption of State Banking Law, 18 Ann. Rev. Banking L. 221, 265-66 (1999) (principle stated in explanation of Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), United States v. Shimer, 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961), and Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). See also Health Ins. Ass'n of America, Inc. v. Shala, 306 U.S.App.D.C. 104, 23 F.3d 412, 422-423, 126 A.L.R. Fed. 793 (D.C.Cir. 1994) (explaining that the proper distinction is that a "legislative rule" is "necessary in order to make a statutory scheme fully operative").

[19] An interpretive rule may be applied retroactively as an expression of an existing statute. Alvarado Parkway Institute, Inc. v. Mendez, 789 F.Supp. 1190, 1195 (D.D.C.1992) ("An interpretive rule, in contrast, 'is an agency statement interpreting an existing statute or rule.' . . . Such rules clarify or explain, or remind parties of existing obligations. . . .Because existing obligations remain unchanged, the retroactive effect of an interpretive rule has been upheld when reasonable." (Citations omitted.)
If the Guidelines were considered as "legislative" they would not be applied retroactively in the absence of legislative expression to that effect or when necessarily required. Dolese Bros. v. State ex rel. Oklahoma Tax Commission, 2003 OK 4, n. 14, 64 P.3d 1093, 1098 quoting Bowen v. Georgetown University Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("... congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result [citations omitted]. By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.").

[20] Alleged error must be raised in the trial court to preserve the issue as a ground urged as error on appeal. Bane v. Anderson, Bryant & Co., 1989 OK 140, 786 P.2d 1230, 1236; In re Sara O.,1993 OK 10, 847 P.2d 768, 770. No party has pointed to either (1) a public policy expressed in the new Guidelines that should be applied in this case, or (2) any exception to the general principle that our appellate review should be confined to reviewing alleged error based upon issues that were presented to the trial court.

[21] 44 Fed. Reg. 67,594, Part F., Dispositions, at F. 3 (b), Good Cause To Modify Preferences ("(b) The burden of establishing the existence of good cause not to follow the order of preferences ... shall be on the party urging that the preferences not be followed.").

[22] Colton v. Huntleigh USA Corp., 2005 OK 46, ¶ 10, 121 P.3d 1070, 1073 (the burden of proof as to any particular fact rests upon the party asserting such fact, and when a party must plead and prove will depend upon whether the fact is part of a cause of action or part of a defense).

[23] For example, the Cherokee Nation relies upon: (1) In re B.B.A., 2009 OK CIV APP 80, ¶ 5, 224 P.3d 1285 (released for publication by order of the Court of Civil Appeals), ("we hold the trial court's determination of good cause should be reviewed for an abuse of discretion."), citing In re Adoption of B.G.J., 281 Kan. 552, 133 P.3d 1, 9 (Kan.2006); In re Adoption of Sara J., 123 P.3d 1017, 1021 (Alaska 2005); Matter of Baby Boy Doe, 127 Idaho 452, 461, 902 P.2d 477, 486 (Idaho 1995); and Matter of Adoption of M., 66 Wash.App. 475, 483, 832 P.2d 518, 522-23 (Wash.App.1992); and (2) In re D.L., 2013 OK CIV APP 30, ¶ 4, 298 P.3d 1203 (released for publication by order of the Court of Civil Appeals.), ("The question of whether there is good cause to deviate from the ICWA preferences is a factual determination to be made by the trial court. We therefore review the court's determination for abuse of discretion."), citing In re B.B.A., supra.
A different division of the Court of Civil Appeals has used the clear-and-convincing standard. In re Adoption of Baby Girl B., 2003 OK CIV APP 24, ¶ 77, 67 P.3d 359 ("This Court holds that, in the specific context of Section 1915(b) placements, the party opposing the statutory preferences must establish good cause according to the 'clear and convincing' evidence standard.").

[24] In re BTW, 2010 OK 69, ¶ 16, 241 P.3d 199, 206 ("Abuse of discretion is the standard of review for the conclusion we reach here . . . A trial court's findings concerning visitation and placement of a child previously adjudicated as deprived are matters of equitable cognizance."); In re BTW, 2008 OK 80, ¶ 20, 195 P.3d 896, 908 ("The instant cause concerns the trial court's findings regarding a change in placement and visitation. . . are left to the sound discretion of the trial court . . . [and] We uphold such decisions absent a determination that the trial court's decision is clearly against the weight of the evidence so as to constitute an abuse of discretion.").

[25] The trial court order before us does not terminate parental rights, and we are not called upon to apply the beyond-a-reasonable-doubt standard expressly stated in 25 U.S.C. § 1912(f): "No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child."

[26] In re M.S., 2010 OK 46, 237 P.3d 161.

[27] In re M.S., 2010 OK 46, ¶ 13, 237 P.3d at 166.

[28] In re M.S., 2010 OK 46, ¶ 17, 237 P.3d at 167.

[29] In re M.S., 2010 OK 46, ¶ 17, 237 P.3d at 167.

[30] Matter of Baby Boy Doe, 127 Idaho 452, 902 P.2d 477, 486 (1995) quoting 44 Fed.Reg. 67584 (1979) and citing S.Rep. No. 597, 95th Cong., 1st Sess. 17 (1977) ("The introductory language to the BIA guidelines regarding ICWA state that use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding . . .In view of the trial court's superior position to ascertain the facts, and the flexibility Congress intended trial courts to have regarding the 'good cause' determination, we believe this determination should be commended to the sound discretion of the trial court, and will not be upset on appeal absent an abuse of discretion.").

[31] In re Alexandria P., (2014) 228 Cal.App. 4th 1322, 1352, 176 Cal.Rptr.3d 468 (CA-2, Div. 5; rehg den; rev den), citing Guidelines, supra, 44 Fed.Reg. at p. 67586.

[32] Santosky v. Kramer, 455 U.S. 745, 754-755, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), quoting Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

[33] Johnson v. Board of Governors of Registered Dentists of State of Okla., 1996 OK 41, 913 P.2d 1339, 1345.

[34] Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 50, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989).

[35] 2004 OK 93, 103 P.3d 1099.

[36] 10 O.S.2011 § 40.1:
The purpose of the Oklahoma Indian Child Welfare Act is the clarification of state policies and procedures regarding the implementation by the State of Oklahoma of the federal Indian Child Welfare Act, P.L. 95-608.2 It shall be the policy of the state to recognize that Indian tribes and nations have a valid governmental interest in Indian children regardless of whether or not said children are in the physical or legal custody of an Indian parent or Indian custodian at the time state proceedings are initiated. It shall be the policy of the state to cooperate fully with Indian tribes in Oklahoma in order to ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced.

[37] In the Matter of Baby Boy L., 2004 OK 93, ¶ 17, 103 P.3d 1099, citing 10 O.S.§ 40.1, as amended in 1994.

[38] 2007 OK 40, 160 P.3d 967.

[39] Cherokee Nation v. Nomura, 2007 OK 40, n. 20, 160 P.3d 967, 977 citing In re Adoption of B.G.J., 33 Kan.App.2d 894, 111 P.3d 651, 657-58 (2005), judgment affirmed, In re Adoption of B.G.J., 281 Kan. 552, 133 P.3d 1 (2006).

[40] In re Adoption of B.G.J., 111 P.3d at 657.

[41] 25 U.S.C.A. § 1915 (c) states in part that "Where appropriate, the preference of the . . . parent shall be considered...."

[42] 25 U.S.C.A. § 1902:
The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

[43] 10A O.S. 2011 §§ 1-1-101 through 1-9-122, and all statutes enacted and codified in "this title" are considered as part of the Oklahoma Children's Code. 10A O.S.2011 § 1-1-101(A) & (B).

[44] 10A O.S. 2011 § 1-1-102 (C)(1):
C. Whenever it is necessary for a child to be placed outside the home pursuant to the Oklahoma Children's Code, it is the intent of the Legislature that:
1. Each child shall be assured the care, guidance, and supervision in a permanent home or foster home that will serve the best interests of the child including, but not limited to, the development of the moral, emotional, spiritual, mental, social, educational, and physical well-being of the child....

[45] 10A O.S. 2011 § 1-1-102 (E):
E. It is the intent of the Legislature that the paramount consideration in all proceedings within the Oklahoma Children's Code is the best interests of the child.
See also Saul v. Alcorn, 2007 OK 90, ¶ 12, 176 P.3d 346, 351 ("Under the Oklahoma Children's Code, the paramount consideration in all proceedings concerning a child alleged or found to be deprived is the health, safety and best interests of the chid. The purposes of laws relating to deprived children are to secure the permanency, care, health, safety and welfare of the child and to preserve family ties whenever possible.")

[46] See, e.g., In re K.S., 448 S.W.3d 521, 533 (Tex. App.-Tyler 2014, pet. denied) (Family Code of Texas does not serve as an obstacle to the realization of the ICWA's purpose, and the two may be read in harmony). But see, Yavapai-Apache Tribe v. Mejia, 906 S.W.2d 152, 169 (Tex.App.-Houston [14th Dist.] 1995, orig. proceeding [leave denied] ) (consideration of the best interests of the child in determining whether good cause exists for transferring jurisdiction is improper because "it allows Anglo cultural biases into the analysis"); In re W.D.H., 43 S.W.3d 30, 37 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (Family Code applies a best interests of the child "Anglo" standard and conflicts with the ICWA).

[47] 10 O.S.2011 § 40.6 states in part: "The placement references specified in 25 U.S.C. Section 1915, shall apply to all preadjudicatory placements as well as preadoptive, adoptive and foster care placements."
We are not called upon to examine every provision in the ICWA and determine its agreement with Oklahoma law. But see, e.g., Matter of J.S., 2008 OK CIV APP 15, ¶ 11, 177 P.3d 590, 593 (released for publication by order of the Court of Civil Appeals) (noting that heightened standard of proof for the factual determination required by 25 U.S.C. § 1912(f) and the lesser state-law mandated standard of clear and convincing evidence is applicable to other state law requirements for parental termination); Valerie M. v. Arizona Dept. of Economic Sec., 219 Ariz. 331, ¶ 18, 198 P.3d 1203, 1207 (2009) (collecting cases from many states and concluding that the ICWA allows states to specify the standard of proof for state-law findings distinct from the findings required by the ICWA).

[48] Our Legislature has recognized that permanency in placement is in the best interests of a child. 10A O.S. 2011 § 1-1-102 (B)(6).

[49] See, e.g., 10A O.S.Supp. 2014 § 1-4-805 (when child has resided for three months with a foster parent or group home statute specifies procedure for removal of the child, and in paragraph "C" states limiting repeated movement and creating stability is a goal of the procedure therein).

[50] A comparison of Matter of Custody of S.E.G., 521 N.W.2d 357 (Minn. 1994), and In re Adoption of Sara J., 123 P.3d 1017 (Alaska 2005), illustrates this point.
In S.E.G., the court explained that "Implicit in the trial court's findings that the children's need for permanence was not being met . . . [at a] foster home . . . [and] only adoption could meet a need for permanence. We believe this holding was based on the improper assumption that the need for permanence could only be met through adoption and, therefore, we reverse this holding as a matter of law." Id. 521 N.W. 2d at 364.
In Sara J., the court commented that S.E.G. "held that evidence of a special need for permanence must be presented by qualified experts with knowledge of the Indian community, suggesting that 'permanency' is defined differently in Native American cultures.'" 123 P.3d at 1028-1029. Sara J. held that the children's special needs in that case "do not implicate the determination of suitability for a preferred placement and need not be analyzed using the prevailing social and cultural standards of the Indian community."123 P.3d at 1029.

[51] Tucker v. Cochran Firm-Criminal Defense Birmingham, L.L.C., 2014 OK 112, ¶ 21, n. 27, 341 P.3d 673, 682, citing In re Initiative Petition No. 397, State Question No. 767, 2014 OK 23, ¶ 39, 326 P.3d 496, 511 and Colton v. Huntleigh USA Corp., 2005 OK 46, ¶ 10, 121 P.3d 1070, 1073.

[52] 25 U.S.C.A. § 1903 (1) and (4):
For the purposes of this chapter, except as may be specifically provided otherwise, the term--
(1) "child custody proceeding" shall mean and include--
(i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;
(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption.
Such term or terms shall not include a placement based upon an act which, if committed by an adult, would be deemed a crime or upon an award, in a divorce proceeding, of custody to one of the parents. . . .
(4) "Indian child" means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe; . . . .

[53] Tucker v. Cochran Firm-Criminal Defense Birmingham, L.L.C., supra, at note 51; 44 Fed.Reg. 67,594. Part F., Dispositions, at F. 3 (a) (i-iii), Good Cause To Modify Preferences.

[54] This Court has the discretion to take judicial notice of the dockets of District Courts. Dutton v. City of Midwest City, 2015 OK 51, ¶ 38, 353 P.3d 532, 550. Our discretionary expansion of the appellate record through the procedure of judicial notice is consistent with this Court's authority to require supplementation of an appellate record pursuant to Okla. Sup. Ct. R. 1.28(h), and the Court's common-law power to issue a discretionary writ of certiorari for transmittal of trial court records to an appellate court. Cf. State ex rel. Bd. of Regents of University of Oklahoma v. Lucas, 2014 OK 14, n. 11, 297 P.3d 378, 385 (A discretionary constitutional writ of certiorari may be used to bring up a record of an inferior court to a superior court for review of jurisdictional error.).

[55] Adoption Assistance and Child Welfare Act of 1980, P.L. 96-272, 42 U.S.C. §§ 620 et seq. and §§ 670 et seq.

[56] Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115, is codified in noncontiguous sections of 42 U.S.C.

[57] See, e.g., P.L. 105-89, § 101(a)(15)(A), amending 42 U.S.C. § 671(a)(15)(A), (regarding efforts to reunify the child and the family the Act states that ". . . in determining reasonable efforts to be made with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern").

[58] See, e.g., 42 U.S.C. § 675(5)(C) (" . . . to assure each child in foster care under the supervision of the State of a permanency hearing to be held, in a family or juvenile court or another court [including a tribal court] of competent jurisdiction, . . . no later than 12 months after the date the child is considered to have entered foster care . . . . "); Ernestine Steward Gray, The Adoption and Safe Families Act of 1997 Confronting an American Tragedy, 46 La. B.J. 477, 478 (April 1999) (". . . because foster care is temporary, the ASFA mandates that permanency planning begin immediately and requires timely decision making for permanency in greatly compressed time frames. ASFA requires permanency hearings to be held within 12 months of removal.").

[59] 10A O.S.Supp.2012 § 1-1-105 (4), (21), (23), (48), & (56) (amended by 2015 Okla. Sess. Laws Ch. 173 § 1 (H.B. 1078), eff. Nov. 1, 2015, with no change to these five definitions, except that "48" is renumbered "47"): "When used in the Oklahoma Children's Code, unless the context otherwise requires: . . . 4. 'Adjudicatory hearing' means a hearing by the court as provided by Section 1-4-601 of this title; ... 21. 'Dispositional hearing' means a hearing by the court as provided by Section 1-4-706 of this title; ... 23. 'Emergency custody' means the custody of a child prior to adjudication of the child following issuance of an order of the district court pursuant to Section 1-4-201 of this title or following issuance of an order of the district court pursuant to an emergency custody hearing, as specified by Section 1-4-203 of this title;...48. 'Permanency hearing' means a hearing by the court pursuant to Section 1-4-811 of this title; ... 56. 'Review hearing' means a hearing by the court pursuant to Section 1-4-807 of this title;...."

[60] 10A O.S.Supp.2012 § 1-4-811 (B) (amended by 2015 Okla. Sess. Laws Ch. 173 § 5 (H.B. 1078), eff. Nov. 1, 2015, with no change to "B"): "B. A permanency hearing may be held concurrently with a dispositional or review hearing."

[61] 10A O.S.Supp.2012 § 1-4-811 (E) in part & (F) in part, as amended by 2015 Okla. Sess. Laws Ch. 173 § 5 (H.B. 1078), eff. Nov. 1, 2015):
E. A transcript shall be made of each permanency hearing or the proceeding shall be memorialized by appropriate written findings of facts, and the court having considered all relevant information shall order one of the following permanency plans for the child:
1. Reunification with the parent, parents, or legal guardian of the child where:
a. reunification can be expected to occur within an established time frame that is consistent with the developmental needs of the child, and
b. the health and safety of the child can be adequately safeguarded if returned home;
2. Placement for adoption after the rights of the parents have been terminated or after a petition has been filed to terminate parental rights;
3. Placement with a person who will be the permanent guardian of the child and is able to adequately and appropriately safeguard the health, safety, and welfare of the child; or
4. a. Placement in the legal custody of the Department under a planned alternative permanent living arrangement placement . . . .
F. In addition to the findings required under subsection E of this section, the court shall also make written findings related to:
1. Whether the Department has made reasonable efforts to finalize the permanency plan that is in effect for the child and a summary of the efforts the Department has made; or, in the case of an Indian child, whether the Department has made active efforts to provide remedial services and rehabilitative programs as required by 25 U.S.C., Section 1912(d); . . . .

[62] A child is considered to have entered out-of-home placement on the earlier of: (a) the adjudication date, or (b) the date that is sixty (60) days after the date on which the child is removed from the home. 10A O.S.Supp.2012 § 1-4-811 (A)(2), as amended by 2015 Okla. Sess. Laws Ch. 173 § 5 (H.B. 1078), eff. Nov. 1, 2015.

[63] 10A O.S.Supp.2012 § 1-4-811 (E)(1), as amended by 2015 Okla. Sess. Laws Ch. 173 § 5 (H.B. 1078), eff. Nov. 1, 2015.

[64] See, e.g., Randi Mendelbaum, Re-Examining and Re-Defining Permanency from a Youth's Perspective, 43 Cap. U. L. Rev. 259, 269-270 (2015) (citing the Adoption and Safe Families Act, § 103(a) & § 103 (c)(2)(B) [42 U.S.C. § 675 (2012)], and noting that the 12-month ASFA permanency hearing to determine if the plan should be changed to something other than parental reunification, and the requirement of pursuing the termination of parental rights for children in foster care for fifteen of the last twenty-two months, unless placement with a relative is being pursued or there are other compelling reasons.).

[65] We note that the 2015 version of the Guidelines state that the "active efforts" requirements of the ICWA for reunification of a child with the child's parents and tribal community are separate and distinct requirements from the Adoption and Safe Families Act, and "ASFA's exceptions to reunification efforts do not apply to ICWA proceedings." Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, February 25, 2015, 80 Fed. Reg. at 10150-10151.

[66] We note that some authors have discussed the different approaches to permanency found in the ICWA and the ASFA, with a recognition of tribal-care traditions achieving one type of permanency without termination of parental rights followed by an adoption. See, e.g., Barbara Ann Atwood, Wells Conference on Adoption Law: Achieving Permanency for American Indian and Alaska Native Children: Lessons from Tribal Traditions, 37 Cap. U.L.Rev. 239, 240-241 (2008) ("Two federal laws with contrasting approaches to permanency have particular relevance: the Indian Child Welfare Act of 1978 (ICWA) and the Adoption and Safe Families Act of 1975 (ASFA). While permanency, a centerpiece of ASFA, is not mentioned in ICWA, permanency as a goal for Indian children is consistent with the basic themes of ICWA.").

[67] A serious emotional or physical need requiring treatment or services would be memorialized in an individual treatment and service plan and or one of the court's orders reviewing a plan for a child adjudicated deprived. See, e.g., 10A O.S.2011 § 1-4-704 (A)(B) ("A. The Department of Human Services or licensed child-placing agency shall prepare and maintain a written individualized service plan for any child that has been adjudicated to be a deprived child. B. The plan shall be furnished to the court . . . be made available to counsel for the parties and any applicable tribe.") (material omitted); 10A O.S.Supp 2014 § 1-4-807 (D)(1) (on a review of a case a court will determine "whether the individualized service plan, services, and placement meet the special needs and best interests of the child . . . .").

[68] Barbara Ann Atwood, Flashpoints Under the Indian Child Welfare Act: Toward a New Understanding of State Court Resistance, 51 Emory L. J. 587, 651-653 (2002).

[69] In re C.H., 299 Mont. 62, 2000 MT64, 997 P.2d 776, 783-784.

[70] Matter of Custody of S.E.G., A.L.W. and V.M.G., 521 N.W.2d 357, 363-364 (Minn.1994).

[71] In re Adoption of Sara J., 123 P.3d 1017, 1029-1030 (Alaska 2005).

[72] In re Adoption of Sara J., 123 P.3d at n. 64, 1029.

[73] 10A O.S.2011 § 1-4-812 (C)(1), states in part: "The court shall consider, without limitation: ...the child's ties with the foster family...."

[74] 25 U.S.C.A. § 1915 (d): Social and cultural standards applicable - The standards to be applied in meeting the preference requirements of this section shall be the prevailing social and cultural standards of the Indian community in which the parent or extended family resides or with which the parent or extended family members maintain social and cultural ties.

[75] We note that 25 U.S.C.A. § 1903 (4) states that an "Indian child" means any unmarried person who is under age eighteen who is eligible for membership in an Indian tribe. Appellants' argument does not adequately explain how even if the child's father could void his membership in the tribe such action would necessarily destroy the child's eligibility for membership in the tribe.

[76] Thompson v. County of Franklin, 180 F.R.D. 216, 225 (N.D.N.Y.1998), quoting Felix S. Cohen, Handbook of Federal Indian Law, 22 (1982 ed.).

[77] Thompson v. County of Franklin, 180 F.R.D. at 225, quoting Cohen, Handbook of Federal Indian Law, at 22 (emphasis deleted).

[78] In Delaware Tribal Business Committee v. Weeks, 430 U.S. 73, 78, 97 S.Ct. 911, 51 L.Ed.2d 173 (1977) the Court explained that an 1866 treaty provided that Kansas Delawares who agreed to "dissolve their relations with their tribe" and become citizens of the United States might elect to remain in Kansas where they would receive eighty acres of land in Kansas in fee simple and a "just proportion" of the tribe's credits "then held in trust by the United States," but thereafter could not "further participate in their (tribal) councils, nor share in their property or annuities."

[79] United States v. Wheeler, 435 U.S. 313, 322, n. 18, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).

[80] Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978).

[81] United States v. Wheeler, 435 U.S. 313, 322, n. 18, citing Red Bird v. United States ("Cherokee Intermarriage Cases,"), 203 U.S. 76, 27 S.Ct. 29, 51 L.Ed. 96 (1906); Roff v. Burney, 168 U.S. 218, 222-223, 18 S.Ct. 60, 62, 42 L.Ed. 442 (1897).
Santa Clara Pueblo v. Martinez, 436 U.S. 49, 55, citing Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897).

[82] Santa Clara Pueblo v. Martinez, 436 U.S. at 55 quoting Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832), and citing several U. S. Supreme Court opinions including United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); and Roff v. Burney, 168 U.S. 218, 18 S.Ct. 60, 42 L.Ed. 442 (1897). See also Martinez v. Southern Ute Tribe, 249 F.2d 915, 920 (10th Cir. 1957) ("The courts have consistently recognized that in absence of express legislation by Congress to the contrary, a tribe has the complete authority to determine all questions of its own membership, as a political entity.").

[83] State ex rel. Oklahoma Bar Ass'n v. Gasaway, 1993 OK 133, 863 P.2d 1189, 1193, (emphasis added) citing National Labor Relations Board v. Granite State Joint Board, 409 U.S. 213, 216, 93 S.Ct. 385, 387, 34 L.Ed.2d 422 (1972); Booster Lodge No. 405 v. National Labor Relations Board, 412 U.S. 84, 88, 93 S.Ct. 1961, 1964, 36 L.Ed.2d 764 (1973); Borgraefe v. Supreme Lodge, K.L.H., 26 Mo.App. 218 (1887).

[84] State ex rel. Oklahoma Bar Ass'n v. Gasaway, 863 P.2d at 1193-1194, citing, Guinn v. Church of Christ of Collinsville, 1989 OK 8, 775 P.2d 766, 776; Oklahoma Association of Insurance Agents v. Hudson, 1963 OK 199, 385 P.2d 453, 455-456; Braddom v. Three Point Coal Corporation, 288 Ky. 734, 157 S.W.2d 349, 352 (1941); Progressive Grocers' Ass'n. Inc. v. Golden, 76 U.S.App.D.C. 21, 128 F.2d 318, 319 (1942); Associated Hat Manufacturers v. Baird-Unteidt Co., 88 Conn. 332, 91 A. 373, 378 (1914); Haynes v. Annandale Golf Club, 4 Cal.2d 28, 47 P.2d 470, 471 (1935).

[85] Of course, "Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).

[86] Tribal membership requirements are not governed, or regulated, or restricted by the laws of the State of Oklahoma, but by federal statutes and treaties. United States v. Wheeler, supra, and Santa Clara Pueblo v. Martinez, supra.

[87] In the Matter of Baby Boy Doe, 123 Idaho 464, 849 P.2d 925, (1993) cert. denied, Swenson v. Oglala Sioux Tribe, 510 U.S. 860, 114 S.Ct. 173, 126 L.Ed.2d 133 (1993).

[88] But see, e.g., Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874 (2nd Cir.1996). (Habeas corpus action did not lie against tribe, but against tribal officials allegedly acting in violation of the Indian Civil Rights Act of 1968 [ICRA], 25 U.S.C. §§ 1301-1303, when stripping membership from members found guilty of treason; and while membership was an internal matter for the tribe, the power of Congress over the matter of citizenship in Indian tribes is plenary, and Congress provided the remedy of an action in a United States District Court.); Valenzuela v. Silversmith, 699 F.3d 1199, 1202-1203, 1205-1207 (10th Cir.2012) (explaining Poodry, habeas corpus remedy, and requirement for exhaustion in tribal courts of a challenge to tribal authority).

[89] Carbajal v. Precision Builders, Inc., 2014 OK 62, n. 20, 333 P.3d 258, 265, citing In re Guardianship of Stanfield, 2012 OK 8, n. 55, 276 P.3d 989, 1002 (unsworn statements by counsel do not constitute evidence); Willis v. Sequoyah House, Inc., 2008 OK 87, ¶¶ 12-13, 194 P.3d 1285, 1289-1290 (same).

[90] Henson v. Johnson, 1926 OK 278, 246 P. 868, 870 ("the courts of the state would take judicial notice of the statute laws of the Five Civilized Tribes"), citing Scott v. Jacobs, 1911 OK 107, 126 P. 780; Guthrie v. Mitchell et vir, 1913 OK 261, 132 P. 138, 49 L. R. A. (N. S.) 724.

[91] We need not determine in this proceeding whether, or to what extent, the trial court may rely upon an internet website for judicial notice of foreign law in effect at a particular time.

[92] May-Li Barki, M.D., Inc. v. Liberty Bank & Trust, Co., 1999 OK 87, ¶ 9, 20 P.3d 135, 144 (supp. opinion on denial of rehearing) ("But no counterappeal is necessary to argue that, in spite of errors committed at nisi prius, the judgment is nonetheless impervious to reversal because it is correct in result.") citing Woolfolk v. Semrod, 1960 OK 98, 351 P.2d 742, 745; Price v. Reed, 1986 OK 43, 725 P.2d 1254, 1261.

[93] In re Assessment of Personal Property Taxes, 2008 OK 94, n. 85, 234 P.3d 938, 960, cert. denied sub nom. Missouri Gas Energy v. Schmidt, 559 U.S. 970, 130 S.Ct. 1685, 176 L.Ed.2d 179 (2010) ("An appellate court will affirm a correct judgment on any applicable theory."); Merritt v. Merritt, 2003 OK 68, ¶ 17, 73 P.3d 878, 883 (same); McDaniel v. McCauley, 1962 OK 72, 371 P.2d 486, 489 (same).

[94] State v. Torres, 2004 OK 12, ¶ 7, 87 P.3d 572, 578.

[95] 1990 OK 66, 796 P.2d 276.

[96] In re Guardianship of Stanfield, 2012 OK 8, ¶ 27, 276 P.3d 989 ("This Court does not make first-instance determinations of disputed issues of either law or fact in the exercise of its appellate jurisdiction."); Hedges v. Hedges, 2002 OK 92, ¶ 23, 66 P.3d 364, 373 ("But when reviewing an equity case, an appellate court cannot exercise first-instance cognizance by making original findings of fact.").

[97] Chamberlin v. Chamberlin, 1986 OK 30, 720 P.2d 721, 723-724, citing Frey v. Independence Fire and Cas. Co., Okl., 1985 OK 25, 698 P.2d 17, 20; Eckel v. Adair, 1984 OK 86, 698 P.2d 921, 925; In Re Hess' Estate, 1962 OK 74, 379 P.2d 851, 859; Owens v. Luckett, 1943 OK 264, 139 P.2d 806, 807. See also In re Guardianship of Stanfield, supra, and Hedges v. Hedges, supra, at note 96.
The alleged facts submitted by the reply brief occurred prior to the trial court hearing, do not alter this Court's power to administer complete appellate relief; and they do not fit within an exception to the general rule. See, e.g., Nichols v. Nichols, 2009 OK 43, ¶ 23, 222 P.3d 1049, 1057 ("While appellate scrutiny is generally confined strictly to the record of proceedings conducted below, a well-recognized exception allows an appellate tribunal to consider those after-occurring facts, transpiring during the pendency of an appeal, which may adversely affect the reviewing court's capacity fully to administer effective relief.").

[98] See opinions cited in note 97 supra, as well as Ray v. Ray, 2006 OK 30, ¶ 12, 136 P.3d 634, 637 ("The appellant bears the undivided responsibility for producing to a court of review a record that will adequately demonstrate error in the trial court's decree . . . The appealing party must include in the record for appeal all materials necessary for corrective relief."); State v. Torres, 2004 OK 12, n. 31, 87 P.3d 572, 581 ("An appellant bears total responsibility for including in the appellate record all materials necessary for corrective relief.") citing Hulsey v. Mid-America Preferred Ins. Co., 1989 OK 107, ¶ 7, 777 P.2d 932, 936; Hamid v. Sew Original, 1982 OK 46, ¶ 7, 645 P.2d 496, 497.

[99] 12 O.S.Supp.2014 Ch. 15, App. 1, Okla. Sup. Ct. Rule 1.33(d):
(d) Definition of Record on Appeal.
The record on appeal shall consist only of those portions of the "entire trial court record" properly designated by a party to the appeal or ordered by the appellate court. The "entire trial court record" shall consist of all papers and exhibits filed in the trial court, the reporter's notes and transcripts of proceedings, and the entries on the appearance docket in the office of the trial court clerk. A copy of the appearance docket shall be included in the record on appeal.
Only papers filed and exhibits presented to the trial court together with transcripts necessary to the appeal may be included in the record on appeal.
Although the Supreme Court Rules were amended in 2013 and the 2014 codification is cited, the language in Rule 1.33 is not of recent origin. See, e.g., 12 O.S. 2001 Ch. 15, App. 1, Okla. Sup. Ct. R. 1.33(d) (same language).

[100] In Re Initiative Petn. No. 397, State Question No. 767, 2014 OK 23, ¶ 39, n. 51, 326 P.3d 496, 512.

[101] Colton v. Huntleigh USA Corp., 2005 OK 46, ¶ 10, 121 P.3d 1070, 1073.

[102] Colton v. Huntleigh USA Corp., at ¶ 10, 121 P.3d at 1073; In Re Initiative Petn. No. 397, State Question No. 767, at n. 51, 326 P.3d at 512.
 
 
 
 
 
 
 
 




 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2003 OK CIV APP 24, 67 P.3d 359, IN THE MATTER OF THE ADOPTION OF BABY GIRL B.
Discussed
 2008 OK CIV APP 15, 177 P.3d 590, IN THE MATTER OF J.S.
Discussed
 2009 OK CIV APP 80, 224 P.3d 1285, IN THE MATTER OF B.B.A.
Discussed
 2013 OK CIV APP 30, 298 P.3d 1203, IN THE MATTER OF D.L.
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 1986 OK 43, 725 P.2d 1254, 57 OBJ 1704, Price v. Reed
Discussed
 1988 OK 39, 754 P.2d 863, 59 OBJ 1069, N.L., Matter of
Discussed
 1989 OK 8, 775 P.2d 766, 60 OBJ 144, Guinn v. Church of Christ of Collinsville
Discussed
 1989 OK 107, 777 P.2d 932, 60 OBJ 1737, Hulsey v. Mid-America Preferred Ins. Co.
Discussed
 1989 OK 140, 786 P.2d 1230, 60 OBJ 2830, Bane v. Anderson, Bryant & Co.
Discussed
 1913 OK 261, 132 P. 138, 38 Okla. 55, GUTHRIE v. MITCHELL
Discussed
 1990 OK 66, 796 P.2d 276, 61 OBJ 1934, Panama Processes, S.A. v. Cities Service Co.
Discussed
 1993 OK 10, 847 P.2d 768, 64 OBJ 576, Termination of Parental Rights, Matter of
Discussed
 1993 OK 133, 863 P.2d 1189, State ex rel. Oklahoma Bar Ass'n v. Gasaway
Discussed
 1960 OK 98, 351 P.2d 742, WOOLFOLK v. SEMROD
Discussed
 1962 OK 72, 371 P.2d 486, McDANIEL v. McCAULEY
Discussed
 1999 OK 87, 20 P.3d 135, 70 OBJ 3149, May-Li Barki, M.D., Inc. v. Liberty Bank & Trust, Co.
Discussed
 1962 OK 74, 379 P.2d 851, IN RE HESS' ESTATE
Discussed
 1963 OK 199, 385 P.2d 453, OKLAHOMA ASSOCIATION OF INSURANCE AGENTS v. HUDSON
Discussed
 1911 OK 107, 126 P. 780, 31 Okla. 109, SCOTT v. JACOBS
Discussed
 2002 OK 92, 66 P.3d 364, HEDGES v. HEDGES
Discussed
 2003 OK 4, 64 P.3d 1093, DOLESE BROS. CO. v. STATE EX REL. OKLAHOMA TAX COMM.
Discussed
 2003 OK 68, 73 P.3d 878, MERRITT v. MERRITT
Discussed
 2004 OK 12, 87 P.3d 572, STATE v. TORRES
Discussed at Length
 2004 OK 93, 103 P.3d 1099, IN THE MATTER OF BABY BOY L.
Discussed at Length
 2005 OK 46, 121 P.3d 1070, COLTON v. HUNTLEIGH USA CORP.
Discussed at Length
 2006 OK 30, 136 P.3d 634, RAY v. RAY
Discussed
 1996 OK 41, 913 P.2d 1339, 67 OBJ 1027, Johnson v. Bd. Of Gov. of Registered Dentists
Discussed
 2007 OK 40, 160 P.3d 967, CHEROKEE NATION v. NOMURA
Discussed at Length
 2007 OK 90, 176 P.3d 346, SAUL v. ALCORN
Discussed
 2008 OK 80, 195 P.3d 896, IN THE MATTER OF BTW
Discussed
 2008 OK 87, 194 P.3d 1285, WILLIS v. SEQUOYAH HOUSE, INC.
Discussed
 2008 OK 94, 234 P.3d 938, IN THE MATTER OF THE ASSESSMENT OF PERSONAL PROPERTY TAXES
Discussed
 2009 OK 43, 222 P.3d 1049, NICHOLS v. NICHOLS
Discussed
 2010 OK 46, 237 P.3d 161, IN THE MATTER OF: M.S.
Discussed at Length
 2010 OK 69, 241 P.3d 199, IN THE MATTER OF BTW
Discussed
 2011 OK 23, IN RE: AMENDMENTS TO THE OKLAHOMA UNIFORM JURY INSTRUCTIONS FOR JUVENILE CASES
Cited
 2012 OK 8, 276 P.3d 989, IN THE MATTER OF THE GUARDIANSHIP OF STANFIELD
Discussed at Length
 2013 OK 14, 297 P.3d 378, STATE ex rel. BOARD OF REGENTS OF THE UNIVERSITY OF OKLAHOMA v. LUCAS
Cited
 2014 OK 14, 321 P.3d 185, TULSA STOCKYARDS, INC. v. CLARK
Cited
 2014 OK 23, 326 P.3d 496, IN RE: INITIATIVE PETITION NO. 397, STATE QUESTION NO. 767
Discussed at Length
 2014 OK 62, 333 P.3d 258, CARBAJAL v. PRECISION BUILDERS, INC.
Discussed
 2014 OK 112, 341 P.3d 673, TUCKER v. THE COCHRAN FIRM-CRIMINAL DEFENSE BIRMINGHAM L.L.C.
Discussed
 2015 OK 51, 353 P.3d 532, DUTTON v. CITY OF MIDWEST CITY
Discussed
 1982 OK 46, 645 P.2d 496, Hamid v. Sew Original
Discussed
 1926 OK 278, 246 P. 868, 117 Okla. 87, HENSON v. JOHNSON
Discussed
 1943 OK 264, 139 P.2d 806, 192 Okla. 685, OWENS v. LUCKETT
Discussed
 1984 OK 86, 698 P.2d 921, Eckel v. Adair
Discussed
 1985 OK 25, 698 P.2d 17, Frey v. Independence Fire and Cas. Co.
Discussed
 1986 OK 30, 720 P.2d 721, 57 OBJ 1415, Chamberlin v. Chamberlin
Discussed
Title 10. Children
 Cite
Name
Level

 10 O.S. 40.1, Purpose - Policy of State
Discussed at Length
 10 O.S. 40.2, Definitions
Cited
 10 O.S. 40.6, Placement Preference
Discussed at Length